IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

TODD SZEWCZYK, JUAN DONES-CRUZ, and KIMBERLY RUCKER, on behalf of themselves and all others similarly situated, )
)
)
)
)
)
Plaintiffs,          )          Civil Action No. 2:19-cv-01109-JP
)
v.                          )
)
UNITED PARCEL SERVICE, INC.,          )
)
Defendant.          )
_____ )

ORDER

AND NOW, on this _____ day of _____, 2019, upon consideration of Defendant United Parcel Service, Inc.'s Motion to Dismiss Plaintiffs' Complaint, and any response thereto, it is hereby ORDERED and DECREED that Defendant's Motion is GRANTED.  Plaintiffs' Complaint and all claims against Defendant are hereby DISMISSED with prejudice.

_____
Honorable John R. Padova

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

TODD SZEWCZYK, JUAN DONES-   )
CRUZ, and KIMBERLY RUCKER, on   )
behalf of themselves and all others   )
similarly situated,   )
   )
            Plaintiffs,   )            Civil Action No. 2:19-cv-01109-JP
   )
v.   )
   )
UNITED PARCEL SERVICE, INC.,   )
   )
            Defendant.   )
_____   )

## DEFENDANT'S MOTION TO DISMISS

Defendant United Parcel Service, Inc. ("UPS"), respectfully moves this Court, pursuant

to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6), to dismiss Plaintiffs' Complaint for

failure to state a claim and for lack of personal jurisdiction.  In support thereof, UPS relies upon,

and incorporates herein by reference, its Memorandum of Law filed concurrently herewith.

*[Signature on following page]*

Respectfully submitted this 16th day of May, 2019.

*s/ James T. Moughan*

James T. Moughan
BENNETT BRICKLIN &
SALTZBURG LLC
1601 Market Street, 16th Floor
Philadelphia, PA 19103-2326
Telephone: (215) 665-3402
moughan@bbs-law.com

R. Steve Ensor (*admitted pro hac vice*)
Alexandra G. Barnett (*admitted pro hac vice*)
ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, Georgia  30309-3424
Telephone:  (404) 881-7000
alexandra.barnett@alston.com
steve.ensor@alston.com

*Attorneys for Defendant United Parcel Service, Inc.*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TODD SZEWCZYK, JUAN DONES-CRUZ, and KIMBERLY RUCKER, on behalf of themselves and all others similarly situated, | ) ) ) ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 2:19-cv-01109-JP |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED PARCEL SERVICE, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT'S MOTION TO DISMISS

Defendant United Parcel Service, Inc. ("UPS") respectfully submits this Memorandum of

Law in support of its Motion to Dismiss the Complaint, showing the Court as follows:

I.        INTRODUCTION

In this putative class/collective action, former UPS package car drivers Todd Szewczyk

("Szewczyk") and Juan Dones-Cruz ("Dones-Cruz), and former UPS driver helper Kimberly

Rucker ("Rucker"), allege that UPS failed to pay them overtime compensation in violation of the

Fair Labor Standards Act ("FLSA"), the Pennsylvania Minimum Wage Act ("PMWA"), and the

Pennsylvania Wage Payment and Collection Law ("WPCL").  Plaintiff Szewczyk additionally

claims that he was retaliated against after requesting payment for alleged off-the-clock work.

Each of Plaintiffs' claims is facially deficient, and therefore subject to dismissal as a matter of

law.

Specifically, Plaintiffs' Complaint is subject to dismissal in its entirety, pursuant to Fed.

R. Civ. P. 12(b)(6), because it fails to state a claim upon which relief can be granted.  First,

Plaintiffs' FLSA and PMWA claims fail as a matter of law because Plaintiffs fall within the Motor Carrier Act Exemption, an insuperable barrier to recovery.  Second, Plaintiffs' WPCL claims fail because the underlying contractual right to wages is the parties' collective bargaining agreement, and thus this claim is preempted by Section 301 of the Labor Management Relations Act ("LMRA").  Lastly, Plaintiff Szewczyk's FLSA retaliation claim suffers fatal flaws because Szewczyk fails to allege that he engaged in protected activity or that he experienced an adverse action.

Additionally, Plaintiff Rucker's claim is subject to dismissal for the separate and additional reason that it fails for lack of personal jurisdiction, pursuant to Fed. R. Civ. P. 12(b)(2).  UPS is neither incorporated in Pennsylvania nor has its principal place of business in Pennsylvania, and is therefore not subject to the general jurisdiction in this State.  Moreover, Rucker worked for UPS in Virginia, and she resides in Maryland.  Her sole claim against UPS in the Complaint, an FLSA claim for overtime wages to which she contends she is entitled, does not involve any alleged conduct by UPS occurring in Pennsylvania.  As such, this Court cannot exercise specific jurisdiction over UPS as to Plaintiff Rucker's claim without violating Constitutional due process rights and the United States Supreme Court's recent decision in *Bristol-Myers Squibb Co. v. Superior Court*, 137 S. Ct. 1773, 1779-80 (2017) (holding that in cases involving multiple plaintiffs there must be a connection between the forum and the specific plaintiff's claim at issue).

On these bases, as elaborated herein, UPS respectfully asks the Court to dismiss the Complaint, and all claims asserted against UPS, in its entirety.

II.     ARGUMENT AND CITATION OF AUTHORITY

A.   The Complaint Fails To State A Claim Upon Which Relief Can Be Granted.

1.   Motion To Dismiss Standard Under Fed. R. Civ. P. 12(b)(6).

Following the Supreme Court's decisions in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009), pleading standards in federal actions have shifted from simple notice pleading to a more-heightened form of pleading, requiring a plaintiff to allege facts sufficient to show that the plaintiff has a "plausible claim for relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009). A facially plausible claim may not be supported by conclusory allegations, but must allow the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. This standard requires "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Moreover, a pleading is not sufficient if it tenders "naked assertion[s]" devoid of "further factual enhancement." *Id.* at 557. Here, after stripping the Complaint of labels, conclusions, and naked assertions, no actionable claims remain.

2.   Plaintiffs' FLSA And PMWA Claims (Counts I, II, And III) Fail To State A Claim Because Plaintiffs Are Exempt From Those Statutes Under The Motor Carrier Act Exemption.

Plaintiffs' claims for overtime under the FLSA and the PMWA fail to state a plausible claim for relief because the Plaintiffs are exempt from those statutes under the Motor Carrier Act exemption.[1] In 1935, Congress passed the Motor Carrier Act ("MCA"), authorizing the

_____

[1]     The argument that Plaintiffs fall within an exemption to the FLSA is generally considered an affirmative defense, and "the employer has the burden of establishing an exemption." *Mazzarella v. Fast Rig Support, LLC*, No. 3:13-2844, 2014 U.S. Dist. LEXIS 84947, at *8 (M.D. Pa. June 23, 2014) (quoting *Buckley v. Kinder*, 2013 U.S. Dist. LEXIS 31325, 2013 WL 941562,

Interstate Commerce Commission (now called the Department of Transportation ("DOT")) to regulate individuals engaged in "safety-affecting activities" for motor carriers operating in interstate commerce. Ch. 498, 49 Stat. 543 (1935). Three years later, Congress enacted the FLSA. Ch. 676, § 1, 52 Stat. 1060 (1938). To eliminate the possibility of conflicting motor-carrier safety regulations and wage-hour regulations, Congress made it clear that employees subject to DOT regulations regarding qualifications and maximum hours of service are exempted from the FLSA. *See* 29 U.S.C. § 213(b)(1) ("The [overtime] provisions of section 207 of this title shall not apply [to] any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service."); *see also Levinson v. Spector Motor Serv.*, 330 U.S. 649, 661 (1947) ("Congress has prohibited the overlapping of the jurisdiction of the [DOL] with that of the [DOT] as to maximum hours of service."); *McMaster v. E. Armored Servs., Inc.*, 780 F.3d 167, 171 (3d Cir. 2015) (recognizing that the MCA "establish[es] a strict separation between the Secretary of Transportation's jurisdiction and the ambit of the [FLSA's] overtime guarantee"). The PMWA is applied in the same way as the FLSA and contains a near identical exemption for employees "of a motor carrier with respect to whom the Federal Secretary of Transportation has power to establish qualifications and maximum hours of service under 49 U.S.C. § 3102(b)(1) and (2)." 43 Pa. Cons. Stat. Ann. § 333.105(b)(7).

An employee is exempt from the FLSA and PMWA overtime provisions by virtue of the Motor Carrier Act exemption if (1) the employee is employed by a carrier subject to the

---

at *1 (D.N.J. Mar. 6, 2013) (citing *Pignataro v. Port Auth.*, 593 F.3d 265, 268 (3d Cir. 2010)). "On a Rule 12(b)(6) motion, an affirmative defense ... is appropriately considered only if it presents an insuperable barrier to recovery by the plaintiff." *Id.* (quoting *Flight Sys., Inc., v. Electronic Data Sys. Corp.*, 112 F.3d 124, 127 (3d Cir. 1997)). Accepting the well-pleaded allegations in the Complaint as true, as one must at this motion to dismiss stage, it is clear that the Motor Carrier Act exemption presents an insuperable barrier to recovery for Plaintiffs.

jurisdiction of the MCA, and (2) the employee is "engage[d] in activities of a character directly affecting the safety of operation of motor vehicles in the transportation on the public highways of passengers or property in interstate or foreign commerce." *See* 29 C.F.R. 782.2.  In this case, both elements are met categorically as a matter of law.

    *i.    UPS is a carrier subject to the jurisdiction of the Motor Carrier Act.*

    To qualify as a motor carrier subject to the MCA's jurisdiction, a motor carrier must (1) provide motor vehicle transportation for compensation, 49 U.S.C. § 13102(14); and (2) transport passengers or property in interstate commerce, 49 U.S.C. § 13501.  Courts routinely hold that package delivery companies, including specifically UPS, are motor carriers subject to the jurisdiction of the MCA.  *See e.g., Buckner v. UPS*, No. 5:09-CV-411-BR, 2012 U.S. Dist. LEXIS 63711, at *12 (E.D.N.C. May 7, 2012) (The court first finds that UPS clearly qualifies as a motor carrier under the MCA because it transports commodities for compensation."); *Shoemaker v. United Parcel Serv., Inc.*, No. 1:10-CV-185-EJL-CWD, 2011 U.S. Dist. LEXIS 24000, at *23 (D. Idaho Feb. 10, 2011) ("UPS unquestionably provides the transportation of property in interstate commerce, and therefore UPS is subject to DOT regulations."); *Smith v. United Parcel Serv., Inc.*, 890 F. Supp. 523, 529 (D. W. Va. 1995) (finding that UPS drivers are exempt from the FLSA under the Motor Carrier Exemption); *see also e.g., Tidd v. Adecco USA, Inc.*, No. 07-11214-GAO, 2008 U.S. Dist. LEXIS 69825, at *12 (D. Mass. Sep. 17, 2008) ("FedEx uses 'commercial motor vehicles' to transport property in interstate commerce … and is therefore a 'motor carrier' … as to whose employees the Secretary of Transportation has the power to prescribe requirements for maximum hours of service…. Accordingly, the Motor Carrier Act Exemption applies, 29 U.S.C. § 213(b)(1), and the plaintiffs' claims under the FLSA are foreclosed.").

The allegations in the Complaint, accepted as true for purposes of this Motion, clearly establish that UPS (1) provides motor vehicle transportation of commodities for compensation, and (2) transports property in interstate commerce.  Specifically, the Complaint alleges:

> 25.    UPS is "the world's largest package delivery company and a leading global provider of specialized transportation and logistics services." *See* https://www.ups.com/us/en/about.page, last accessed on March 15, 2019.
>
> 26.    UPS operates in more than 220 countries and employs more than 400,000 individuals, including drivers and driver helpers throughout the United States, who pick-up, transport, and deliver packages and other goods to and from, among other places, "every address in North America" using the company's distinctly brown delivery vans. *See* https://pressroom.ups.com/pressroom/ContentDetailsViewer.page?ConceptType=FactSheets&id=1426321563187-193, last accessed on March 15, 2019.
>
> 27.    In 2018, UPS delivered 5.2 billion packages and documents globally and had total revenues of $58 billion. *Id.*
>
> 30.    At all relevant times, UPS … employed individuals, including Plaintiffs, who were engaged in interstate commerce or in the production of goods for interstate commerce or engaged in handling, receiving, selling, or otherwise working on goods or material that have been moved in or produced for interstate commerce.

(Compl. ¶¶ 25-30).  Accordingly, as evident from the allegations in the Complaint, UPS is a motor carrier subject to the jurisdiction of the Motor Carrier Act.

### ii.    *Plaintiffs were engaged in activities affecting the safety of operation of motor vehicles.*

It is axiomatic that driving is an activity that directly affects the safety of operation of a motor vehicle.  *See Levinson v. Spector Motor Serv.*, 330 U.S. 649, 664 (1947) (stating that the Commission's (now called the DOT) jurisdiction under the MCA "undoubtedly extends to drivers"); *Morris v. McComb*, 332 U.S. 422, 430 (1947) ("The drivers are full-time drivers of motor vehicles well within the definition of that class of work by the Commission if the work is done in interstate commerce."); *see also Benson v. Universal Ambulance Serv., Inc.*, 675 F.2d 783, 786 (6th Cir. 1982) ("It would appear to be beyond question that the driver of

a common carrier vehicle directly affects the safety of operation of that vehicle."); *Mayan v. Rydbom Express, Inc.*, No. 07-2658, 2009 U.S. Dist. LEXIS 90525, at *11 (E.D. Pa. Sep. 30, 2009) ("The duties of drivers affect safety of operation ... so drivers employed by motor carriers covered by the Motor Carrier Act are subject exclusively to the authority of the Secretary of Transportation."); *Buckner*, 2012 U.S. Dist. LEXIS 63711, at *17 (finding that UPS driver's employment activities "directly affect safety of operation"); *Shoemaker*, 2011 U.S. Dist. LEXIS 24000, at *28 (finding that UPS on-road supervisor who was an "occasional driver" engaged in activities "directly affecting the safety of operation of vehicles"). Employees in certain non-driving positions – including specifically driver's helpers – also affect the safe operation of vehicles and are subject to the MCA's jurisdiction. *See* 29 C.F.R. § 782.2(b)(2) (stating that the MCA exemption is applicable to those employees "whose work involves engagement in activities consisting wholly or in part of a class of work which is defined: (i) As that of a driver, driver's helper, loader, or mechanic"). Under the FLSA regulations, a "driver's helper" is defined as "an employee other than a driver, who is required to ride on a motor vehicle when it is being operated in interstate or foreign commerce." 29 C.F.R. § 782.4(a).

The Complaint unequivocally states that Plaintiffs Szewczyk and Dones-Cruz were drivers of the brown UPS package cars. (Compl. ¶ 8 (alleging that "throughout his employment with Defendant Plaintiff Szewczyk was a driver of a brown delivery truck performing pick-ups, transfers, and deliveries of packages"), ¶ 14 (alleging same for Plaintiff Dones-Cruz)). The Complaint also alleges that Plaintiff Rucker was a "driver helper working in a brown delivery truck assisting in the pick-up, transfer and delivery of packages." (Compl. ¶ 20). Accordingly, as evident from the allegations in the Complaint and the applicable regulations, Plaintiffs were engaged in activities affecting the safety of operation of motor vehicles.

### iii.   _Plaintiffs were engaged in activities affecting interstate commerce._

Where the employee's activities constitute part of a continuous movement of property across state lines, the interstate commerce requirement of the MCA exemption is met.  _See_ 29 C.F.R. § 782.7(b)(1).  This is true even when the employee's activities take place solely within a single State.  _See id._ ("Transportation within a single State is in interstate commerce within the meaning of the [FLSA] where it forms a part of a 'practical continuity of movement' across State lines from the point of origin to the point of destination."); _Mazzarella v. Fast Rig Support, LLC_, 823 F.3d 786, 791 (3d Cir. 2016) (citing _Bilyou v. Dutchess Beer Distribs., Inc.,_ 300 F.3d 217, 219-20 (2d Cir. 2002) (holding that MCA exemption applied to drivers of distributor where distributor brought beverages into New York from out of state, then had drivers deliver the beverages to customers solely within the state)); _Shoemaker_, 2011 U.S. Dist. LEXIS 24000, at *23 ("UPS package car drivers, even though they may be driving intrastate, are involved in interstate commerce because they are on the last leg of the package's journey from its original destination to its final delivery place.").

In the Complaint, Plaintiffs allege that UPS employs drivers and driver helpers, including Plaintiffs, throughout the United States "who pick-up, transport, and deliver packages and other goods to and from, among other places, 'every address in North America' using the company's distinctly brown delivery vans."  (Compl. ¶ 26).  Moreover, Plaintiffs expressly allege that UPS employs individuals, "including Plaintiffs, who were engaged in interstate commerce or in the production of goods for interstate commerce or engaged in handling, receiving, selling, or otherwise working on goods or material that have been moved in or produced for interstate commerce."  (Compl. ¶ 30).  Therefore, as evident from the allegations in the Complaint, it is undisputed that Plaintiffs were engaged in activities affecting interstate commerce.

Accordingly, accepting the well-pleaded allegations in the Complaint as true for purposes of this Motion, it is clear that the Motor Carrier Act exemption presents an insurmountable barrier to recovery for Plaintiffs' FLSA and PMWA claims. As such, these claims should be dismissed.

3.   Plaintiffs' Pennsylvania WPCL Claim (Count IV) Is Preempted By Federal Labor Law.

The Complaint fails to state a claim upon which relief can be granted under the WPCL, 43 Pa. Cons. Stat. § 260.3(a), because any such claim is preempted by the LMRA. The WPCL provides a civil remedy for employees to recover unpaid wages from their employers. 43 Pa. Cons. Stat. § 260.9a(b). The WPCL does not, however, create a general right to compensation. *De Asencio v. Tyson Foods, Inc.*, 342 F.3d 301, 309 (3d Cir. 2003) (citing *Antol v. Esposto*, 100 F.3d 1111, 1117 (3d Cir. 1996)). Instead, it simply "provides a statutory remedy when the employer breaches a contractual obligation to pay earned wages." *Id.* (quoting *Antol*, 100 F.3d at 1117); *Kafando v. Erie Ceramic Arts Co.*, 2000 PA Super 377, 764 A.2d 59, 61 (Pa. Super. Ct. 2000) ("The WPCL does not create an employee's substantive right to compensation; rather, it only establishes an employee's right to enforce payment of wages and compensation to which an employee is otherwise entitled by the terms of an agreement."). The contract between the parties governs in determining whether specific wages are actually owed. *Id.* Thus, in order to survive a motion to dismiss under Rule 12(b)(6), a plaintiff bringing a WPCL claim must allege a contractual right to claimed wages. *Rosario v. First Student Mgmt. LLC*, 247 F. Supp. 3d 560, 568 (E.D. Pa. 2017).

Additionally, it is well established that "when resolution of a state-law claim is substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract, that claim must either be treated as a § 301 claim [under the LMRA]. . . or

dismissed as pre-empted by federal labor-contract law." *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 220 (1985). This preemption rule is well-established and ensures that federal law will be the basis for interpreting collective bargaining agreements. *Lingle v. Norge Div. Of Magic Chef, Inc.,* 486 U.S. 399, 405-06, 409 (1988).

In the context of the WPCL, the Third Circuit Court of Appeals has expressly held that the WPCL "is preempted by the Labor Management Relations Act and the National Labor Relations Act" where there is a collective bargaining agreement involved. *See, e.g., Antol*, 100 F.3d at 1121. Indeed, federal courts in Pennsylvania routinely dismiss WPCL claims on this basis. *See e.g.*, *Rosario*, 247 F. Supp. 3d at 569 (granting motion to dismiss: "As explained above, a WPCL claim necessarily requires the existence of a contract. It only follows that when the contract relied upon to support a WPCL claim is a CBA, that claim is preempted by § 301 of the LMRA."); *Hughes v. UPS*, No. 14-3822, 2015 U.S. Dist. LEXIS 28219, at *12 (E.D. Pa. Mar. 6, 2015) (granting motion to dismiss: "Supreme Court precedent unequivocally instructs us to resolve disputes concerning collectively bargained labor agreements pursuant to federal labor law rather than state law."); *Andrako v. U.S. Steel Corp.*, No. 07-1629, 2008 U.S. Dist. LEXIS 37617, at *23 (W.D. Pa. May 8, 2008) ("[E]ven though Plaintiff's WPCL claim may not turn on an interpretation of a disputed provision in the CBA, it is squarely based on the CBA and, therefore, is preempted."); *Townsend v. BC Nat. Chicken LLC*, Civil Action No. 06-4317, 2007 U.S. Dist. LEXIS 8282, at *17 (E.D. Pa. Feb. 2, 2007) (granting motion to dismiss: "§ 301 of the LMRA completely preempts the WPCL whenever a collective-bargaining agreement is at issue."); *Local Union No. 98, IBEW v. Morris*, No. 04-1988, 2004 U.S. Dist. LEXIS 13156, at *11 (E.D. Pa. July 9, 2004) ("We will grant the motion to dismiss the WPCL cause of action for failure to state a claim because it is preempted by and thus is not viable under federal law.").

In Paragraph 187 of the Complaint, Plaintiffs allege:

> Upon information and belief, the hourly rate for the wages owed to Plaintiffs Szewczyk and Dones-Cruz and the members of the PA Delivery Driver Class is set by Defendant, which has entered into collective bargaining agreements with organized labor.

(Compl. ¶ 187). Despite acknowledging the "collective bargaining agreements" which establish the "hourly rate for the wages owed to Plaintiffs," Plaintiffs also allege that "wage rates and other terms and conditions of their employment ... are orally agreed upon with Defendant," and that such oral agreement "constituted an enforceable contract for the provision and payment of services." (Compl. ¶¶ 78-79). These conflicting allegations necessarily involve an examination and interpretation of the referenced collective bargaining agreements.[2] The collective bargaining agreements expressly set forth the Plaintiffs' right to payment of wages: "All employees covered by this Agreement shall be paid for all time spent in service of the Employer." (CBA, Art. 17). Moreover, Article 6, Section 1 of the applicable collective bargaining agreements prohibits and

---

[2]     Relevant portions of the collective bargaining agreements in effect during the time period relevant to Plaintiffs' claims, which establish the right to payment of wages, are attached hereto as Exhibits 1 and 2 to the Declaration of Craig Holmes (hereinafter cited to as (CBA, Art. ___)). The Court may consider the CBA in deciding this Motion. *See Rosario*, 247 F. Supp. 3d at 568 n.10 ("I may consider the CBA produced by defendants.") (citing *Rogan v. Giant Eagle, Inc.*, 113 F. Supp. 2d 777, 780-81 (W.D. Pa. 2000) ("[A] plaintiff's failure to attach or cite documents explicitly relied on or integral to the complaint does not preclude the court, when considering a motion to dismiss, from reviewing the text of these extrinsic documents."), *aff'd*, 276 F.3d 579 (3d Cir. 2001); *In re Asbestos Prods. Liab. Litig. (No. VI)*, 822 F.3d 125, 133 n.7 (3d Cir. 2016) ("In deciding motions under Rule 12(b)(6), courts may consider 'document[s] integral to or explicitly relied upon in the complaint,' . . . or any 'undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document'")); *see also Hughes*, 2015 U.S. Dist. LEXIS 28219, at *8 (rejecting plaintiffs' argument that defendants could not attach a copy of the CBA to their motion to dismiss on the basis that it would be improper to "deny Defendants the right to rely upon the very CBA that forms the basis of [the plaintiffs'] relationship with their employer, and that forms the basis of each of their claims. Defendants' attachment of the CBA to their Motions to Dismiss, and their reliance upon the CBA, is perfectly proper").

voids any contracts between UPS and any individual employee which conflict with any provisions of the CBA:

> Employer agrees not to enter into, or attempt to enter into, any agreement or contract with its employees, either individually or collectively, or to require or attempt to require employees to sign any document, either individually or collectively, which in any way conflicts with the provisions of this Agreement. Any such Agreement or document shall be null and void.

(CBA, Art. 6). Because Plaintiffs' WPCL is based squarely on the terms of the collective bargaining agreement, or at the very least requires interpretation of the collective bargaining agreement in light of the alleged oral agreement, Plaintiffs' WPCL claim is preempted by the LMRA.[3]

### 4. Plaintiffs Szewczyk's FLSA Retaliation Claim (Count V) Fails To State A Claim Because There Is No Protected Activity Or Adverse Action.

Plaintiff Szewczyk separately claims that he was retaliated against after requesting payment for alleged off-the-clock work. To state a *prima facie* claim of retaliatory discrimination under the FLSA, a plaintiff must plead that (1) he engaged in protected activity, (2) the employer took an adverse employment action against him, and (3) there was a causal link

---

[3]     Additionally, any argument that the preempted WPCL claim should proceed as a hybrid § 301/fair representation LMRA claim also fails for several reasons. Any such claim is barred because the Complaint is devoid of any factual allegations suggesting that the Plaintiffs exhausted the grievance and arbitration remedies set forth in the collective bargaining agreement. *See DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 163-64 (1983) (holding that an employee is first required to "attempt to exhaust any grievance or arbitration remedies provided in the collective bargaining agreement"). Moreover, as to Plaintiffs Szewczyk and Dones-Cruz, the complaint clearly was not filed within the applicable six-month limitations period. *See id.* at 172 (holding that the applicable statute of limitations for § 301 hybrid claims is six months). Furthermore, the complaint contains no facts showing that the union breached its duty of fair representation to the Plaintiffs or that UPS breached the collective bargaining agreement. *See Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry*, 494 U.S. 558, 569 (1990) ("Respondent must prove both that [the employer] violated § 301 by breaching the collective-bargaining agreement and that the Union breached its duty of fair representation."). Accordingly, Plaintiffs have not and cannot state a hybrid § 301/duty of fair representation claim under the LMRA.

between the plaintiff's protected action and the employer's adverse action. *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 300 (3d Cir. 2007).

> i.   *Plaintiff's allegations are insufficient to establish that he engaged in any protected activity.*

As to the first prong of the prima facie face, an employee engages in protected activity when "he has filed any complaint or instituted or caused to be instituted any proceeding under or related to [the FLSA]." 29 U.S.C. § 215(a)(3). The Circuit Courts of Appeal are split as to whether internal complaints are protected activity under the FLSA. *Edwards v. A.H. Cornell & Son, Inc.*, 610 F.3d 217, 224 n.8 (3d Cir. 2010) (surveying cases). The Third Circuit has not expressly decided whether informal complaints to employers are protected activity. *Id.* at 224 ("There is a circuit split on this issue, which we have not yet joined."). The Third Circuit has, however, cited the majority approach in dicta. *Brock v. Richardson*, 812 F.2d 121, 124 (3d Cir. 1987). District Courts, taking *Brock* as a cue, generally have found that making an informal complaint to an employer may qualify as protected activity for purposes of setting forth a retaliation claim under the FLSA. However, even under this interpretation, "[t]o fall within the scope of the antiretaliation provision, a complaint must be sufficiently clear and detailed for a reasonable employer to understand it, in light of both content and context, as an assertion of rights protected by the statute and a call for their protection." *Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 14 (2011). That is, "'not all amorphous expressions of discontent' constitute complaints within the meaning of the statute." *Vargas v. Gen. Nutrition Ctrs., Inc.*, No. 10-867, 2011 U.S. Dist. LEXIS 1155, at *21 (W.D. Pa. Jan. 6, 2011) (explaining that there must be "some overt form of protest") (citing *Lambert v. Ackerley*, 180 F. 3d 997, 1007-1008 (9th Cir. 1999); *Hardwick v. Complete Skycap Servs.*, 247 F. App'x 42 (9th Cir. 2007) (finding that complaints about salaries and tipping system without suggestions that the

employer had violated the law in any way did not constitute complaints within the meaning of the statute); *Valerio v. Putnam Assocs., Inc.*, 173 F.3d 35, 44-45 (1st Cir. 1999) (finding that "abstract grumblings," *i.e.*, "concerns and comments [that] are too generalized and informal to constitute 'complaints'" will not suffice)). The Third Circuit has held, in the Title VII context, that "[a] general complaint of unfair treatment is insufficient to establish protected activity," *Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*, 450 F.3d 130, 135 (3d Cir. 2006), and "complaints must be specific enough to notify management of the particular type of discrimination at issue in order to constitute protected activity," *Sanchez v. SunGard Availability Servs. LP*, 362 F. App'x 283, 288 (3d Cir. 2010).

In the Complaint, Plaintiff Szewczyk fails to allege that he made a clear and detailed complaint to UPS that the Company could reasonably perceive as an assertion of rights protected by FLSA. Plaintiff's sole allegation setting forth his alleged protective activity states merely that he "approached his manager and requested that [UPS] pay him the compensation he was owed for working off-the-clock." (Compl. ¶ 107). Accordingly, without factual allegations of an overt complaint to UPS about the Company's overtime policies or practices, the claim of retaliation must fail.

    ii. *Plaintiff's allegations are insufficient to establish that he suffered an adverse action.*

Under the second prong of the prima facie case, retaliatory conduct rises to the level of a materially adverse action if the conduct alters the "employee's compensation, terms, conditions or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee." *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1300 (3d Cir. 1997).

In the Complaint, Plaintiff Szewczyk acknowledges that he voluntarily "resigned his employment at UPS." (Compl. ¶ 110). Accordingly, without any allegation that Szewczyk endured a materially adverse action, his claim of retaliation must fail.

B.   Plaintiff Rucker's Claim (Count II) Must Be Dismissed For Lack Of Personal Jurisdiction Over UPS.

1.   Motion To Dismiss Standard Under Fed. R. Civ. P. 12(b)(2).

When the Court's jurisdiction is challenged by a defendant, it is the plaintiff's burden to prove, by "affidavits or other competent evidence that jurisdiction is proper." *Dayhoff Inc. v. H.J. Heinz Co.*, 86 F.3d 1287, 1302 (3d Cir. 1996). Initially, a plaintiff only needs to establish a *prima facie* case for personal jurisdiction. However, "once the defendant raises the question of personal jurisdiction, the plaintiff bears the burden to prove, by a preponderance of the evidence, facts sufficient to establish jurisdiction." *Carteret Sav. Bank, F.A. v. Shushan*, 954 F.2d 141, 146 (3d Cir. 1992).

A federal district court generally applies the law of the state in which it sits for purposes of assessing personal jurisdiction. *See* Fed. R. Civ. P. 4(k)(1)(A). Pennsylvania courts may exercise two types of *in personam* jurisdiction over a non-resident defendant: general jurisdiction and specific jurisdiction. *See* 42 Pa. C.S. § 5301 (general jurisdiction) and 42 Pa. C.S. § 5322 (specific jurisdiction); *see also Bristol-Myers Squibb Co.*, 137 S. Ct. at 1779-80 ("Since our seminal decision in *International Shoe*, our decisions have recognized two types of personal jurisdiction: "general" (sometimes called "all-purpose") jurisdiction and "specific" (sometimes called "case-linked" jurisdiction."). The exercise of either type of personal jurisdiction over a non-resident defendant must be consistent with the Due Process Clause of the United States Constitution.

2.    UPS Is Not Incorporated In Nor Does It Have Its Principal Place Of Business In Pennsylvania, And Is Not Subject To General Personal Jurisdiction In This Court.

In *Daimler AG v. Bauman*, 134 S. Ct. 746, 749 (2014), the United States Supreme Court clarified the circumstances under which courts can exercise general jurisdiction over corporate defendants.  Under *Daimler*, except in rare and exceptional circumstances[4], there can be no general jurisdiction over a defendant corporation unless that entity is either incorporated in or has a principal place of business in the forum state.  *Id.* at 760-761; *accord Barth v. Walt Disney Parks & Resorts U.S., Inc.*, *see also* 697 F. App'x 119, 119-20 (3d Cir. 2017); *Allaham v. Naddaf*, 635 F. App'x 32, 38-39 (3d Cir. 2015).  Federal district courts in Pennsylvania have consistently applied *Daimler* to limit or dismiss cases for lack of general jurisdiction.  *See e.g.*, *Bar-Ray Prods., Inc. v. Infab Corp.*, 2014 U.S. Dist. LEXIS 156704, at *9 (M.D. Pa. 2014) (concluding that a "continuous and systematic course of business in Pennsylvania" was "not enough"); *Flynn v. Hovensa, LLC*, 2014 U.S. Dist. LEXIS 90703, at *11–12 (W.D. Pa. 2014) (finding no general jurisdiction over a defendant who owns several stores in the forum state, but is not incorporated and does not have its principal place of business there); *accord Roy v. FedEx Ground Package Sys.*, 353 F. Supp. 3d 43, 54 (D. Mass. 2018) ("Because FedEx Ground is a Delaware corporation with its principal place of business in Pennsylvania, there is no dispute that Massachusetts courts do not have general jurisdiction.").

In their Complaint, Plaintiffs allege that UPS is incorporated under the laws of Delaware and maintains its headquarters in Atlanta, Georgia. (Compl. ¶ 24).   The Complaint also

---

[4]    The Supreme Court points to *Perkins v. Benguet Consol. Mining Co.*, 342 U. S. 437 (1952), as the "textbook" example of a case where exceptional circumstances warranted exercising general jurisdiction over a defendant corporation that was not incorporated nor had its principal place of business in the forum.  "In *Perkins*, war had forced the defendant corporation's owner to temporarily relocate the enterprise from the Philippines to Ohio. …Because Ohio then became "the center of the corporation's wartime activities … suit was proper there." *BNSF Ry. v. Tyrrell*, 137 S. Ct. 1549, 1558 (2017).

references two UPS "facilities" located in West Chester and Philadelphia, where Plaintiffs Szewczyk and Dones-Cruz worked, respectively. (*Id.* at ¶¶ 7, 13). Lastly, the Complaint alleges that "UPS regularly conducts business from locations in this district, including in West Chester and Philadelphia, and upon information and belief employs hundreds of delivery drivers and driver helpers in Pennsylvania." (*Id.* at ¶ 37).

In light of *Daimler* and its progeny, these allegations are insufficient to establish that UPS is "at home" and subject to general jurisdiction in Pennsylvania. UPS is neither incorporated nor headquartered in Pennsylvania. While, according to the Complaint, UPS operates at least two facilities in Pennsylvania and regularly conducts business within the state, these are not the type of "exceptional" circumstances that support the exercise of general jurisdiction over UPS in this State. To the contrary, this is precisely the type of continuous and systematic course of business in a forum state that has been determined to be inadequate to support general jurisdiction. A holding otherwise would be "unacceptably grasping," potentially expose UPS to general jurisdiction in every State, and violate due process. *See Daimler*, 571 U.S. at 138, n.19 ("It is one thing to hold a corporation answerable for operations in the forum State . . . quite another to expose it to suit on claims having no connection whatever to the forum State.").

3.   The Conduct Alleged Lacks The Requisite Connection To Pennsylvania To Establish Specific Personal Jurisdiction Over UPS In This Court.

To exercise specific jurisdiction over a defendant, a court must conclude that the defendant's "suit-related conduct" creates a substantial connection with the forum State. *Walden v. Fiore*, 571 U.S. 277, 284 (2014). That is, the court must find a substantial relationship between the forum, the defendant, and the particular plaintiff's claim, so that it is "reasonable" to

call the defendant into that court to defend against that claim. *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980).

In *Bristol-Myers Squibb Co.*, the Supreme Court recently applied these settled principles in a case involving multiple plaintiffs and reaffirmed that the court must find specific personal jurisdiction with respect to each plaintiff's claim. 137 S. Ct. 1773. In that case, 86 California residents and 592 plaintiffs from other States sued Bristol-Meyers Squibb in California, alleging injuries from taking the drug Plavix. *Id.* at 1778. The nonresident plaintiffs did not allege any connections with California: They "were not prescribed Plavix in California, did not purchase Plavix in California, did not ingest Plavix in California, and were not injured by Plavix in California." *Id.* at 1781. Regardless, the California Supreme Court upheld the state court's assertion of specific jurisdiction over the nonresidents' claims on the theory that the nonresidents' claims were "similar in several ways" to the claims of the California residents (for which there was specific jurisdiction). *Id.* at 1778-79. The United States Supreme Court reversed. In so ruling, the Court found no "adequate link between the State and the nonresidents' claims." *Id.* at 1781. The fact that "other plaintiffs" (the resident plaintiffs) "were prescribed, obtained, and ingested Plavix in California – and allegedly sustained the same injuries as did the nonresidents – does not allow the State to assert specific jurisdiction over the nonresidents' claims." *Id.* The defendant must have a sufficient relationship to the forum with respect to each plaintiff's claim; the fact that the defendant has the necessary relationship with respect to some plaintiffs' claims is not sufficient. *Id.* "What is needed – and what is missing here – is a connection between the forum and the specific claims at issue." *Id.* at 1781.

Like the non-resident plaintiffs in *Bristol-Myers Squibb*, Plaintiff Rucker has not alleged, and cannot establish, that UPS conducted any activity in Pennsylvania that gives rise to her

FLSA claim.  Plaintiff Rucker is a resident of Maryland.  At all relevant times, she worked for UPS in Dulles, Virginia "assisting in the pick-up, transfer, and delivery of packages in Virginia." (Compl. ¶¶ 19-20).  She does not allege any conduct on behalf of UPS which occurred in Pennsylvania that gives rise to her FLSA claim for unpaid overtime wages.  In the absence of any connection between Pennsylvania and Plaintiff Rucker's FLSA claim, this Court cannot exercise specific jurisdiction over UPS as to that claim.

Accordingly, as to Plaintiff Rucker's claim, the Court does not have personal jurisdiction over UPS, and Rucker's Complaint must be dismissed pursuant to Fed. R. Civ. P. 12(b)(2).

### III.    CONCLUSION

For the reasons set forth above, Plaintiffs' claims against UPS fail to state a claim upon which relief may be granted and fail to meet the requirements for personal jurisdiction in Pennsylvania.  Consequently, this action must be dismissed with prejudice pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6).  Accordingly, UPS respectfully requests that the Court grant its Motion to Dismiss, dismissing all claims against UPS with prejudice.

Respectfully submitted this 16th day of May, 2019.

*s/ James T. Moughan*

James T. Moughan
BENNETT BRICKLIN &
SALTZBURG LLC
1601 Market Street, 16th Floor
Philadelphia, PA 19103-2326
Telephone: (215) 665-3402
moughan@bbs-law.com

R. Steve Ensor (*admitted pro hac vice*)
Alexandra G. Barnett (*admitted pro hac vice*)
ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, Georgia  30309-3424
Telephone:  (404) 881-7000
alex.barnett@alston.com
steve.ensor@alston.com

*Attorneys for Defendant United Parcel Service, Inc.*

## **CERTIFICATE OF SERVICE**

I hereby certify that the foregoing was filed using the CM/ECF system, which will automatically provide notice to the following attorneys of record by electronic means:

Jason Conway
Daniel C. Levin
William T. Wilson

*s/ James T. Moughan*

James T. Moughan

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| TODD SZEWCZYK, JUAN DONES-CRUZ, and KIMBERLY RUCKER, on behalf of themselves and all others similarly situated,<br><br>               Plaintiffs,<br><br>v.<br><br>UNITED PARCEL SERVICE, INC.,<br><br>               Defendant. | Civil Action No. 2:19-cv-01109-JP |

DECLARATION OF CRAIG HOLMES

I, Craig Holmes, declare as follows:

1.     I am over 18 years of age and competent to make this Declaration. The statements in this Declaration are based upon my personal knowledge and I give this Declaration freely and voluntarily for use in connection with the above referenced action.

2.     I am currently employed by United Parcel Service, Inc., referred to herein as "UPS" or the "Company," as an attorney in the Company's Legal Department.

3.     Through my work as an attorney in UPS's Legal Department, I am involved in the Company's labor and employment matters and have been on UPS's Negotiating Committee related to negotiating the Company's collective bargaining agreements with the Teamsters.

4.     Attached hereto as Exhibit 1 is a true and correct copy of portions of the National Master United Parcel Service Agreement, the collective bargaining agreement between UPS and the Teamsters, which was effective for the period of August 1, 2013 through July 31, 2018.

5.     Attached hereto as Exhibit 2 is a true and correct copy of portions of the National

Master United Parcel Service Agreement, the collective bargaining agreement between UPS and the Teamsters, which is effective for the period of August 1, 2018 through July 31, 2023.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 16th day of May, 2019.

Craig Holmes

# EXHIBIT 1

# NATIONAL MASTER
# UNITED PARCEL SERVICE
# AGREEMENT

**For The Period August 1, 2013
through July 31, 2018**

# PRINCIPAL MASTER

## UNITED PARCEL SERVICE AGREEMENT

### For the Period:
### August 1, 2013 through July 31, 2018

covering:

operations in, between and over all of the states, territories, and possessions of the United States and operations into and out of all contiguous territory. The UNITED PARCEL SERVICE, INC., an Ohio Corporation, and a New York Corporation, in their Common Carrier Operations hereinafter referred to as the "Employer," and the TEAMSTERS UNITED PARCEL SERVICE NATIONAL NEGOTIATING COMMITTEE representing Local Unions affiliated with the INTERNATIONAL BROTHERHOOD OF TEAMSTERS, and Local Union No. _____ which Local Union is affiliated with the INTERNATIONAL BROTHERHOOD OF TEAMSTERS, agree to be bound by the terms and conditions of this Agreement. United Parcel Service Cartage Services, Inc. ("CSI") and UPS Latin America, Inc. is also a party to this Agreement as specified in the Freight Pickup & Delivery Supplemental Agreement ("P&D Supplement") and Challenge Air Cargo Supplement, respectively.

## ARTICLE 1. PARTIES TO THE AGREEMENT

The Employer and the Union adopt this Article and enter into this Agreement with a mutual intent of preserving and protecting work and job opportunities for the employees covered by this Agreement. No bargaining unit work will be subcontracted, transferred, leased, assigned or conveyed except as provided in this Agreement.

### Section 1. Operations Covered

The execution of this Agreement on the part of the Employer shall cover all employees of the Employer in the bargaining unit at any existing centers, new centers, new trailer repair shops, new air hubs and gateway operations, new buildings, and any other new opera-

- 1 -

ARTICLE 1

tions of the Employer within the jurisdiction of the Local Union signatory to this Agreement as determined or may be determined by the International Brotherhood of Teamsters, with regard to wages, hours and other conditions of employment.

Section 2. Employees Covered

Employees covered by this Agreement shall be construed to mean, where already recognized, feeder drivers, package drivers, sorters, loaders, unloaders, porters, office clerical, clerks, mechanics, maintenance personnel (building maintenance), car washers, United Parcel Service employees in the Employer's air operation, and to the extent allowed by law, employees in the export and import operations performing load and unload duties, and other employees of the Employer for whom a signatory Local Union is or may become the bargaining representative.  Employees of CSI and UPS Latin America, Inc. are also covered by this Agreement as specified in the P&D Supplement and the Challenge Air Cargo Supplement, respectively.

In addition, effective August 1, 1987, the Employer recognized as bargaining unit members clerks who are assigned to package center operations, hub center operations, and/or air hub operations whose assignment involves the handling and progressing of merchandise, after it has been tendered to United Parcel Service to effectuate delivery. These jobs cover: package return clerks, bad address clerks, post card room clerks, damage clerks, rewrap clerks, and hub and air hub return clerks. This Agreement also governs the classifications covered in Article 39 - Trailer Repair Shop. Effective no later than February 1, 2003 the Employer recognizes as bargaining unit members FDC/ODC clerks, international auditors, "smart label" clerks and revenue auditors who work in the operations facilities.

Section 3. Transfer of Company Title or Interest

This Agreement shall be binding upon the parties hereto, their successors, administrators, executors and assigns. In the event an entire operation, or portion thereof, or rights only, are sold, leased, transferred or taken over by sale, transfer, lease, assignment, receivership or bankruptcy proceedings, such operation or use of such rights

- 2 -

ARTICLE 1

shall continue to be subject to the terms and conditions of this Agreement, for the life thereof.

On the sale, transfer or lease of an individual run or runs, or rights only, the specific provisions of this Agreement shall prevail. It is understood by this Section that the parties hereto shall not sell, lease or transfer such run or runs or rights to a third (3rd) party to evade this Agreement.

In the event the Employer fails to require the purchaser, the transferee, or lessee to agree to assume the obligations of this Agreement, the Employer (including partners thereof) shall be liable to the Local Union and to employees covered for all damages (including but not limited to monetary damages) sustained as a result of such failure to require assumption of the terms of this Agreement until its expiration date, but shall not be liable after the purchaser, the transferee or lessee has agreed to assume the obligations of this Agreement. The Employer shall give notice of the existence of this Agreement to any purchaser, transferee, lessee, assignee, etc., of the operation covered by this Agreement or any part thereof, including rights only. Such notice shall be in writing with a copy to the Local Union, at the time the seller, transferor, or lessor executes a contract or transaction as herein described. The Teamsters United Parcel Service National Negotiating Committee and Local Unions involved shall also be advised of the exact nature of the transaction, not including financial details.

SECTION 4.

The Employer agrees that it will be a violation of this Section if it, any affiliate, or any other entity under its control enters into a business so as to duplicate the Employer's common carrier operations as defined in Article 1 in any area. Affiliate for purposes of this Section means any entity which is owned, managed or controlled by the Employer or its parent. This Section will also cover an entity if the Employer or its parent maintains the ultimate right to control or approve a decision by such entity.

The Employer will be financially responsible for all losses resulting from a violation of this Section.

ARTICLE 9

future buildings. The Employer further agrees to provide separate toilet and changing facilities for male and female employees in all present and future UPS buildings which have more than fifteen (15) drivers.

The Employer shall implement procedures designed to ensure privacy for all employees when using facilities in UPS buildings with fifteen (15) or fewer drivers.

Such toilet facilities will be equipped with proper ventilation devices and shall be heated as climatic conditions shall warrant.

The Employer agrees to provide lockers for those employees who are required to change into a uniform or take a lunch period. All other employees will be provided a suitable area for keeping personal items and clothes. Assigned lockers will not be opened by the Employer unless either the employee or a Union representative is present.

Where the Employer and the Union agree that the local water is not suitable for drinking, the Employer will provide bottled drinking water.

ARTICLE 6.

Section 1. Extra Contract Agreements

Except as may be otherwise provided in this Agreement, the Employer agrees not to enter into, or attempt to enter into, any agreement or contract with its employees, either individually or collectively, or to require or attempt to require employees to sign any document, either individually or collectively, which in any way conflicts with the provisions of this Agreement. Any such Agreement or document shall be null and void. Any such agreement or document may not be placed in an employee's file or used by the Employer as a basis for discipline or used in connection with any disciplinary proceeding, nor may any such agreement or document nor the contents thereof be divulged to any person or entity.

In addition, the Company will not discipline an employee for refusing to sign any Company form related to the principle of a fair day's work unless the signing is required by law or by this Agreement.

- 15 -

ARTICLE 16

2. Adoption, or placement for foster care;

3. To care for a spouse, child, or parent of the employee due to a serious health condition;

4. A serious health condition of the employee.

The employee's seniority rights shall continue as if the employee had not taken leave under this section, and the Employer will maintain health insurance coverage during the period of the leave.

The Employer may require the employee to substitute accrued paid vacation or other paid leave for part of the 12/6 week leave period.

The employee is required to provide the Employer with at least thirty (30) days advance notice before FMLA leave begins if the need for leave is foreseeable. If the leave is not foreseeable, the employee is required to give notice as soon as practicable. The Employer has the right to require medical certification of a need for leave under this Act. In addition, the Employer has the right to require a second (2nd) opinion at the Employer's expense.

The provisions of this section are in response to the Federal Act and shall not supersede any state or local law, which provides for greater employee rights.

ARTICLE 17. PAID PER TIME

All employees covered by this Agreement shall be paid for all time spent in service of the Employer. Rates of pay provided for by this Agreement shall be minimums. Time shall be computed from the time that the employee is ordered to report for work and registers in and until the employee is effectively released from duty. All time lost due to delays as a result of overloads or certificate violations involving federal, state or city regulations, which occur through no fault of the driver, shall be paid for by the Employer.

The Employer will not allow employees to work prior to their start time without appropriate compensation.

# EXHIBIT 2

# NATIONAL MASTER
# UNITED PARCEL SERVICE
# AGREEMENT

**For The Period August 1, 2018
through July 31, 2023**



**NATIONAL MASTER
UNITED PARCEL SERVICE AGREEMENT**

**For the Period:
August 1, 2018 through July 31, 2023**

covering:

operations in, between and over all of the states, territories, and possessions of the United States and operations into and out of all contiguous territory. The UNITED PARCEL SERVICE, INC., an Ohio Corporation, and a New York Corporation, in their Common Carrier Operations hereinafter referred to as the "Employer," and the TEAMSTERS UNITED PARCEL SERVICE NATIONAL NEGOTIATING COMMITTEE representing Local Unions affiliated with the INTERNATIONAL BROTHERHOOD OF TEAMSTERS, and Local Union No. _____ which Local Union is affiliated with the INTERNATIONAL BROTHERHOOD OF TEAMSTERS, agree to be bound by the terms and conditions of this Agreement. United Parcel Service Cartage Services, Inc. ("CSI") and UPS Latin America, Inc. is also a party to this Agreement as specified in the Freight Pickup & Delivery Supplemental Agreement ("P&D Supplement") and Challenge Air Cargo Supplement, respectively.

# ARTICLE 1. PARTIES TO THE AGREEMENT

The Employer and the Union adopt this Article and enter into this Agreement with a mutual intent of preserving and protecting work and job opportunities for the employees covered by this Agreement. No bargaining unit work will be subcontracted, transferred, leased, assigned or conveyed except as provided in this Agreement.

## Section 1. Operations Covered

The execution of this Agreement on the part of the Employer shall cover all employees of the Employer in the bargaining unit at any existing centers, new centers, new trailer repair shops, new air hubs and gateway operations, new buildings, and any other new operations of the Employer within the jurisdiction of the Local Union

## Article 1

signatory to this Agreement as determined or may be determined by the International Brotherhood of Teamsters, with regard to wages, hours and other conditions of employment.

## Section 2. Employees Covered

Employees covered by this Agreement shall be construed to mean, where already recognized, feeder drivers, package drivers, sorters, loaders, unloaders, porters, office clerical, clerks, customer counter clerks, mechanics, maintenance personnel (building maintenance), car washers, United Parcel Service employees in the Employer's air operation, and to the extent allowed by law, employees in the export and import operations performing load and unload duties, and other employees of the Employer for whom a signatory Local Union is or may become the bargaining representative. Employees of CSI and UPS Latin America, Inc. are also covered by this Agreement as specified in the P&D Supplement and the Challenge Air Cargo Supplement, respectively.

In addition, effective August 1, 1987, the Employer recognized as bargaining unit members clerks who are assigned to package center operations, hub center operations, and/or air hub operations whose assignment involves the handling and progressing of merchandise, after it has been tendered to United Parcel Service to effectuate delivery. These jobs cover: package return clerks, bad address clerks, post card room clerks, damage clerks, rewrap clerks, and hub and air hub return clerks. This Agreement also governs the classifications covered in Article 39—Trailer Repair Shop. Effective no later than February 1, 2003 the Employer recognizes as bargaining unit members FDC/ODC clerks, international auditors, "smart label" clerks and revenue auditors who work in the operations facilities.

## Section 3. Transfer of Company Title or Interest

This Agreement shall be binding upon the parties hereto, their successors, administrators, executors and assigns. In the event an entire operation, or portion thereof, or rights only, are sold, leased, transferred or taken over by sale, transfer, lease, assignment, receivership or bankruptcy proceedings, such operation or use of

such rights shall continue to be subject to the terms and conditions of this Agreement, for the life thereof.

On the sale, transfer or lease of an individual run or runs, or rights only, the specific provisions of this Agreement shall prevail. It is understood by this Section that the parties hereto shall not sell, lease or transfer such run or runs or rights to a third (3rd) party to evade this Agreement.

In the event the Employer fails to require the purchaser, the transferee, or lessee to agree to assume the obligations of this Agreement, the Employer (including partners thereof) shall be liable to the Local Union and to employees covered for all damages (including but not limited to monetary damages) sustained as a result of such failure to require assumption of the terms of this Agreement until its expiration date, but shall not be liable after the purchaser, the transferee or lessee has agreed to assume the obligations of this Agreement. The Employer shall give notice of the existence of this Agreement to any purchaser, transferee, lessee, assignee, etc., of the operation covered by this Agreement or any part thereof, including rights only. Such notice shall be in writing with a copy to the Local Union, at the time the seller, transferor, or lessor executes a contract or transaction as herein described. The Teamsters United Parcel Service National Negotiating Committee and Local Unions involved shall also be advised of the exact nature of the transaction, not including financial details.

## Section 4.

The Employer agrees that it will be a violation of this Section if it, any affiliate, or any other entity under its control enters into a business so as to duplicate the Employer's common carrier operations as defined in Article 1 in any area. Affiliate for purposes of this Section means any entity which is owned, managed or controlled by the Employer or its parent. This Section will also cover an entity if the Employer or its parent maintains the ultimate right to control or approve a decision by such entity.

The Employer will be financially responsible for all losses resulting from a violation of this Section.

Article 6

# ARTICLE 6.

## Section 1. Extra Contract Agreements

Except as may be otherwise provided in this Agreement, the Employer agrees not to enter into, or attempt to enter into, any agreement or contract with its employees, either individually or collectively, or to require or attempt to require employees to sign any document, either individually or collectively, which in any way conflicts with the provisions of this Agreement. Any such Agreement or document shall be null and void. Any such agreement or document may not be placed in an employee's file or used by the Employer as a basis for discipline or used in connection with any disciplinary proceeding, nor may any such agreement or document nor the contents thereof be divulged to any person or entity.

In addition, the Company will not discipline an employee for refusing to sign any Company form related to the principle of a fair day's work unless the signing is required by law or by this Agreement.

## Section 2. Workweek Reduction

If either the Fair Labor Standards Act or the Hours of Service Regulations are subsequently amended so as to result in substantial penalties to either the employees or the Employer, a written notice shall be sent by either party requesting negotiations to amend those provisions which are affected. Thereafter the parties shall enter into immediate negotiations for the purpose of arriving at a mutually satisfactory solution. In the event the parties cannot agree on a solution within sixty (60) days, or mutually agreed extensions thereof after receipt of the stated written notice, either party shall be allowed economic recourse.

## Section 3. New Equipment

Where new types of equipment and/or operations, for which rates of pay are not established by this Agreement, are put into use after the ratification date of this Agreement within operations covered by this Agreement, rates governing such operations shall be subject to negotiations between the parties. This paragraph shall apply to all new types of equipment including office and clerical equipment. In

- 16 -

# ARTICLE 17. PAID FOR TIME

All employees covered by this Agreement shall be paid for all time spent in service of the Employer. Rates of pay provided for by this Agreement shall be minimums. Time shall be computed from the time that the employee is ordered to report for work and registers in and until the employee is effectively released from duty. All time lost due to delays as a result of overloads or certificate violations involving federal, state or city regulations, which occur through no fault of the driver, shall be paid for by the Employer.

The Employer will not allow employees to work prior to their start time without appropriate compensation.

Wages for properly selected vacations, in all instances, will be paid to the employees no later than the workday prior to their vacation. If the employee does not receive his/her vacation check, the Employer will make all reasonable efforts to provide the check the following day including delivery by Saturday or Next Day Air. If the employee requests to see his vacation check on the Monday as permitted below and the Employer fails to make the vacation payment available by Saturday following the employee's regular scheduled pay day, the employee shall be paid an additional amount equal to one-half (1/2) of his or her daily guarantee at his or her regular hourly rate of pay for every subsequent pay period until the shortage is corrected. Other shortages involving more than fifty ($50.00) dollars for full-time employees, and twenty-five ($25.00) dollars for part-time employees, will be corrected and the payment will be made available to the employee at his/her reporting location on his/her second scheduled workday after reporting the shortage. If the Employer fails to make the payment available on the employee's second scheduled workday and the shortage was the result of the Employer's error, the employee will be paid an additional amount equal to one-half (1/2) of his/her daily guarantee at his/her regular hourly rate for every full pay period in which the shortage is not paid after the second (2nd) scheduled work day, until corrected.

Errors of less than fifty ($50.00) dollars for full-time employees or twenty-five ($25.00) dollars for part-time employees and overages